[Cite as *State v. Ceron*, 2013-Ohio-5241.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
### No. 99388

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# MAURICIO CERON

DEFENDANT-APPELLANT

## JUDGMENT:
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-566692

**BEFORE:** Boyle, P.J., Jones, J., and Blackmon, J.

**RELEASED AND JOURNALIZED:** November 27, 2013

**ATTORNEY FOR APPELLANT**

Terry H. Gilbert
Friedman & Gilbert
55 Public Square
Suite 1055
Cleveland, Ohio   44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY:   Nicole Ellis
         Kristin Karkutt
Assistant County Prosecutors
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio   44113

MARY J. BOYLE, P.J.:

**{¶1}** Defendant-appellant, Mauricio Ceron, appeals his convictions for rape, kidnapping, and gross sexual imposition. He raises six assignments of error for our review:

> 1. The trial court erred by admitting prejudicial 404(B) evidence.
>
> 2. The trial court erred in admitting hearsay testimony by the SANE nurse, thereby violating appellant's right to a fair trial, or alternatively by impeaching its own witness without satisfying Evid.R. 617's requirements for doing so.
>
> 3. The trial court committed plain error by allowing egregiously prejudicial statements by the prosecutor in closing arguments.
>
> 4. The conviction for rape is not supported by legally sufficient evidence and is against the manifest weight of the evidence.
>
> 5. The trial court erred in denying appellant's Rule 29 motion for acquittal.
>
> 6. The cumulative error doctrine applies in this case to mandate reversal.

**{¶2}** After review, we find no merit to Ceron's arguments and affirm.

Procedural History and Facts

**{¶3}** In September 2012, Ceron was indicted on three counts: rape in violation of R.C. 2907.02(A)(1)(b), with a furthermore clause that the victim was less than ten years of age; gross sexual imposition in violation of R.C. 2907.05(A)(4); and kidnapping in violation of R.C. 2905.01(A)(4), with a sexual motivation specification. Ceron entered a plea of not guilty, and the case proceeded to a jury trial. The following facts were presented to the jury.

**{¶4}** Jose Hernandez and Kristina Kerfonta were together for approximately six and one-half years. They had three children together, X.H., the victim, who was six years old at the time of trial, and two younger sons, ages four and one years old. Jose and Kristina ended their relationship in March 2012. Jose had visitation with the children every other weekend.

**{¶5}** On Saturday, August 25, 2012, Jose picked his three children up at Kerfonta's home around 6:30 p.m. and drove them to his sister's, Catherine Alvarez's ("Cathy"), house, where he was temporarily staying. Kerfonta packed one backpack for the children, as she always did, that had all of the children's clothes in it, as well as diapers and food. When they arrived at Cathy's house, Santos Alvarez (Jose's father), Ceron (Jose's stepfather), Cathy, and Cathy's children were there. Jose's two older children hugged both of their grandfathers, Santos and Ceron. Jose said that X.H. interacted with Ceron like a normal grandparent and granddaughter do.

**{¶6}** Later in the evening, the children were inside watching a movie. Jose, Santos, and Ceron were sitting on the front porch drinking beer. At some point in the evening, Jose's relatives, Cesar and Eliseo Hernandez, stopped by and had a few beers with them. Jose said that he had around eight or nine beers. He thought that Ceron drank about the same amount of beers that night.

**{¶7}** At some point, Cathy and her children left with Cathy's boyfriend. Santos, who was also living with Cathy at that time, went to bed around midnight. Jose and Ceron were still on the porch. Jose told Ceron that he needed to go to bed. Ceron went

inside to use the bathroom. Jose remained on the porch, finishing his cigarette, while Ceron went inside. Jose testified that "[n]ot even two minutes later" after Ceron had gone inside, Jose grabbed the front door handle to go inside and Ceron was "trying to come outside" at the same time. Jose said that Ceron told him that he was going home. Jose saw Ceron leave quickly, without wearing any shoes. Jose said that Ceron had been wearing shoes earlier in the evening, but Jose did not see him take them off.

{¶8} X.H., the victim, testified that when she was at her Aunt Cathy's house, her grandpa (Ceron) woke her up by pulling her pants down. X.H. said that she was sleeping on the couch in her aunt's living room at the time. X.H. testified that her grandpa "touched [her] privacy" with his fingers. X.H. said that her grandpa also "went on top of her" and "touched [her] privacy again." X.H. testified that her grandpa got off of her when her dad opened the door to come inside the house. X.H. said that she could not get out from underneath her grandpa. She was about to call for her dad, but she started crying. She said she was scared when it happened because she does not like people touching her. X.H. said that her younger brother was also in the room when her grandpa touched her. Her brother was sleeping on her aunt's other couch.

{¶9} Over Ceron's objection, the state then showed X.H. an anatomically correct female doll. X.H. demonstrated on the doll how her grandpa pulled her pants down to about her knees. The state then asked X.H. to demonstrate on the doll how her grandpa touched her. The state stated for the record that X.H. "pressed two fingers to the center of the middle of the doll." The state then asked, "And where you put your two fingers,

[X.H.], what do you call that?" X.H. replied, "[m]y privacy." X.H. further explained that she goes to the bathroom with her "privacy."

{¶10} X.H. identified her Dora the Explorer underwear that she was wearing on the night her grandpa touched her. X.H. said that when her grandpa touched her "privacy," it "hurt." When asked why it "hurt," X.H. said "because he pushed his — he pushed his fingers really down, and it hurts."

{¶11} X.H. testified that she told her dad what happened the following morning. She also told her Aunt Cathy, but she was afraid to tell her grandmother because she did not want to make her feel sad. X.H. testified that her Aunt Cathy helped her take a shower before they went to a birthday party at Edgewater Park for Cathy's twins. X.H. said that her aunt told her to "tell what happened."

{¶12} X.H. testified that her grandpa, Ceron, came to her Aunt Cathy's house in the morning, but she said that she did not talk to him because she did not want to. After the party, X.H. went to her mom's house. X.H. said that her dad told her mom what had happened and her mom started crying. X.H. testified that she did not dream that her grandfather touched her, nor did she make it up.

{¶13} On cross-examination, X.H. stated that when her dad started opening the door, her grandpa heard it and got off of her. X.H. stated that she was trying to put her pants back on when her dad came in the house, but she said that her dad did not see her with her pants pulled down because she thought that he went back outside.

{¶14} Jose testified that after Ceron left that night, Jose slept on the loveseat and all three of his children slept on the long couch. Jose stated that the next morning, X.H. told him that she had to tell him something. Jose said that X.H. seemed scared to tell him. After the conversation, Jose did not know what to do so he called his mother, Morena Hernandez (who was married to Ceron), and told her what X.H. had told him. Morena asked him to wait until after the twins' (Cathy's children) birthday party before doing anything about it.

{¶15} When Ceron arrived at Cathy's house the following Sunday morning, Jose testified that X.H. was afraid of Ceron; X.H. hid behind Cathy. Jose said that X.H. had never been afraid of Ceron before that point. Jose asked Ceron why "he touched [X.H.]" Ceron denied that he did it. Jose said that Ceron first responded that "he might have accidentally touched her when he sat down." Ceron then told Jose that X.H. might have been dreaming.

{¶16} They all went to Edgewater Park for the birthday party, including Ceron. Ceron and X.H. did not interact at the party. Jose said that X.H. played with her cousins and acted normal. After the birthday party, around 9:00 or 10:00 p.m., Jose drove his three children to Kerfonta's house. Jose testified that he told Kerfonta what X.H. had told him that morning.

{¶17} Kerfonta testified that when X.H. got home that Sunday night, X.H. told Kerfonta that she wanted to tell her something. But then X.H. seemed afraid to tell Kerfonta. So Jose had a conversation with Kerfonta. Kerfonta said that she "freaked"

and "panicked" when Jose told her.  Ceron and Morena arrived at that point.  Kerfonta confronted Ceron.  Kerfonta testified that Ceron said that maybe X.H. was dreaming. Ceron told Kerfonta to take X.H. to the hospital to get checked.

{¶18} After Ceron and Morena left, Jose and Kerfonta decided to wait to take X.H. to the hospital until after school the next day because it was X.H.'s first day of first grade and she was excited.

{¶19} Jose said that since the incident, his family, including his mother, does not talk to him.  They think that X.H. is lying.  Jose said his family "turned their back on [him]."

{¶20} On cross-examination, Jose said that Ceron raised him and his sisters.  He agreed that Ceron was a hard worker and had always been there for him.  When asked, "have you ever known him to do anything illegal, dishonest?"  Jose replied that he had. When further asked to explain, Jose said that Ceron "pick[s] up girls from the street." On redirect-examination, Jose further explained that on the night of August 25, 2012, two prostitutes walked by the house around 10:00 p.m.  Ceron called to them and one of the women went inside with Ceron for about 20 minutes.

{¶21} Kerfonta testified that she took X.H. to the hospital after school the next day, on Monday.  Kerfonta gave the clothes that X.H. had been wearing on that Saturday night to the SANE nurse.

{¶22} Kerfonta said that she had a very good relationship with Jose's family before this happened, but they do not speak now.  Kerfonta also testified that after this incident,

X.H. became afraid of men, which was unusual for her.  X.H. locks the bathroom door now so no one can see her change her clothes.

{¶23} On cross-examination, Kerfonta admitted that relations with Jose's family had been strained since she and Jose broke up the previous March 2012.

{¶24} Cathy, Jose's sister and X.H.'s aunt, testified that on the night of August 25, 2012, she made dinner for her children and her nieces and nephews and then put a movie in for them to watch.  Ceron, Santos, and Jose were drinking beer on the front porch.  Cathy left with her boyfriend and her children around midnight or 12:30 a.m.  The next day, Cathy and her children arrived home around noon.  Cathy said that Jose made X.H. tell Cathy what had happened.  Cathy gave X.H. a bath.  Cathy's mother, Morena, and Ceron were there when X.H. was done with her bath.  Cathy said that X.H. sat on the opposite couch from where Ceron was sitting, but X.H. did not appear to be afraid of Ceron.  Cathy said that since this happened she no longer talks to Jose.

{¶25} On cross-examination, Cathy said that Ceron had raised her since she was two years old.  He never did anything inappropriate to her; he was a good provider and took care of her family.  Cathy said that X.H. did not seem upset at the birthday party that Sunday.

{¶26} Michele Reali-Sorrell testified that she is a sexual assault nurse examiner ("SANE") at the Cleveland Clinic.  Reali-Sorrell examined X.H. on Monday, August 27, 2012, at Fairview Hospital.  X.H. told Reali-Sorrell verbatim:

> I was sitting on the couch at my aunt's house.  Wicho [what X.H. called Ceron] sat next to me on the couch.  He pulled my pants down, and he

touched my privates, he put his finger in me.  He got on top of me.  My dad walked in, and he got up and said goodbye.

Reali-Sorrell said that X.H.'s statement was a direct quote because she is not permitted to summarize what the patient says.

{¶27} Reali-Sorrell obtained a DNA sample from X.H.  She also obtained a vaginal swab with a Q-tip because a speculum is too big for a five-year-old child; the speculum would be traumatic and cause more damage.  Reali-Sorrell also took an anal swab with a Q-tip.  She did not observe any injury on X.H.  She did not think it was unusual that X.H. did not have an injury to her vagina since there was only penetration with fingers.  She said the vagina is very flexible and does not easily damage.  Reali-Sorrell also said that bathing or showering removes evidence from a victim.

{¶28} Hristina Lekova testified that she is a forensic DNA analyst at Cuyahoga County Regional Forensic Science Laboratory.  She tested the sexual assault evidence collection kit, including fingernail scrapings, and vaginal, oral, and rectal swabs.  She also tested X.H.'s underwear and pants that she was wearing on the night of the incident, as well as two swabs from the crotch area of X.H.'s underwear.  She said that based on the history of this case, she was not looking for semen or bodily fluids.  She took the two swab samples from X.H.'s underwear because she was looking for "touch DNA."  She explained that when people touch each other, they exchange DNA.  She testified that people shed skin cells all the time, so their DNA can also get on their clothes.  If people's clothes come in contact with one another, their DNA that is on their clothes can transfer as well.  Lekova also tested a buccal swab from Ceron.

**{¶29}** The results of Lekova's testing indicated that there was no "seminal material" in any of the vaginal, oral, or rectal swabs taken from the victim. She explained that she did not expect to find seminal material based on the history. Further, "no DNA profile foreign to [X.H.]" was obtained from the vaginal or rectal swab, or from the two swabs taken from X.H.'s underwear. Lekova explained, however, that male DNA was present on X.H.'s underwear. But because there was an overwhelming amount of X.H.'s DNA on the underwear, it masked the presence of the male DNA. Because of male DNA being masked by X.H.'s DNA, Lekova sent the two swabs from X.H.'s underwear to another department for a Y-STR analysis, which she explained targets only Y chromosomes.

**{¶30}** Christine Scott testified that she is a forensic DNA analyst at the Cuyahoga County medical examiner's office. She performed a Y-STR analysis on the swabs from the "crotch area" of X.H.'s underwear. Scott explained that male DNA was present in the underwear sample, or else she would not have received the sample for further testing.

**{¶31}** Scott explained that she looked at the "sample information from the autosomal test to determine how much male DNA was in the sample; and based on that, [she] amplified it and produced a Y-STR profile." In the profile, Scott found a "mixture" of DNA in X.H.'s underwear, meaning DNA from multiple people. Scott concluded that Ceron could not be excluded from the sample. When explaining why he could not be excluded, Scott stated that she looked at "17 positions" because "[t]hat's

how many [are] in the kit." In explaining her results, she stated: "I found that the sample item 3 [which was the swab from Ceron], at every position his number was in the sample." She explained that "[i]f only one of these positions did not have [Ceron's] number," she "would a hundred percent exclude him." She also saw DNA present from at least two other males.

{¶32} On cross-examination, Scott agreed that the results in this case were "inconclusive." She explained: "[i]t's also possible that you can have include or a match." She stated that "include" would "mean that she could say with scientific certainty that the known item is in the unknown item." She further explained that "match" meant "a statistical probability that [the DNA sample from the unknown] would be a match [to the known sample]." She agreed that she could not say that Ceron's DNA was included in the unknown sample or matched the unknown sample. Scott further agreed that if X.H.'s underwear "came into contact with clothing belonging to the victim's brother," that DNA could be transferred that way.

{¶33} On redirect-examination, Scott explained that there are actually four results that she could have gotten when analyzing the DNA samples. In addition to finding that DNA in an unknown sample is (1) included in the known sample, (2) matches the known sample, or (3) is inconclusive, the results of her testing could "exclude" someone. Scott testified that she could not exclude Ceron from the DNA testing.

{¶34} The state rested. Ceron moved for a Crim.R. 29 acquittal on all counts, which the trial court denied after argument.

{¶35} Five witnesses testified on Ceron's behalf, including Santos Alvarez, Eliseo Hernandez, Morena Hernandez, Carlos Paneda, and Dalia Katz. Ceron also testified at his trial.

{¶36} Ceron testified that he had been working since he was about 12 or 13 years old in El Salvador. He came to the United States in November 1996. He worked at Ohio Meal Supply and a bakery, which his wife owned. On Saturday, August 25, 2012, he said that he and Morena worked at the bakery all day. They also delivered food that they had made. He finished around 5:00 p.m., and then went to Cathy's to mow the grass. Ceron said that when Jose arrived at Cathy's house with the children, X.H. came up to him and hugged him. He said that he did not have any more contact with X.H. that night.

{¶37} Ceron testified that he, Santos, and Jose drank beer on Cathy's front porch. At some point, Eliseo and Cesar stopped by and had some beers with them. Ceron said that Santos left first, and then Eliseo and Cesar. Ceron testified that he left around midnight. Before he left, he said that he went "upstairs to the bathroom." He then went downstairs to look for Jose to say goodbye. Ceron said: "at the time I was opening the door, I — I see Jose right there, and I said, I'm leaving."

{¶38} Ceron stated that he saw children sleeping in the living room, but he could not tell "who was who" because it was dark. Ceron denied that he pulled X.H.'s pants down, and denied that he touched her sexually.

{¶39} Ceron said that he approached X.H. that following Sunday, after Jose confronted him. Ceron asked X.H., "What is going on? Why you saying that?" He said that X.H. just looked down and did not answer him. He testified that X.H. appeared "sad maybe." Ceron said that later, X.H. appeared normal at the birthday party. He did not talk to her there.

{¶40} On cross-examination, Ceron admitted that he "get[s] in trouble when [he] drinks," but not if he is at home. The state asked Ceron, over objection, "isn't it true that after drinking you've been accused of pulling down the pants of other females?" Ceron replied, "no." He admitted that "two women passed by" on the night of August 25, 2012.

{¶41} Carlos Paneda and Dalia Katz, who were both in supervisory positions over Ceron (Katz is married to the owner of Ohio Meal Supply), testified that they had known Ceron for a long time and that he was a very hard worker, responsible, and had an excellent reputation for truth.

{¶42} Santos Alvarez and Eliseo Hernandez testified as to what occurred on the evening of August 25, 2012. They did not add anything that had not already been testified to, except that they both stated that two women came by Cathy's house that night, but they did not see Ceron go in the house with one of them.

{¶43} Morena, Ceron's wife, testified that she had been with Ceron for 19 years, since her children were very young. He helped raise them and was a good father to them. He also set a good example for them. Morena testified that Ceron worked very hard.

{¶44} Morena said that when Jose told her what X.H. had said about Ceron, she told him to take the child to the hospital. She denied that she told him to wait until after the birthday party. She also denied that she ever begged Jose to drop the charges against Ceron. Morena said that she and Kerfonta began having problems when Kerfonta broke up with Jose in March 2012.

{¶45} Morena testified that on Sunday, August 26, 2012, X.H. seemed normal; she played with her cousin, she ate cake, and she took care of her younger brother at the birthday party. She said that X.H. did not seem depressed or scared.

{¶46} Ceron rested his case.

{¶47} Over Ceron's objection, the state recalled two of its witnesses as rebuttal witnesses, Kerfonta and Jose. Kerfonta testified that in December 2010, when she was six months pregnant with her youngest son, she went to sleep in her bed. X.H. and her older son were also sleeping in the bed with her. Jose, Jose's uncle, and Ceron were there; they were all drinking. Kerfonta was not drinking. She went to bed around 11:00 p.m. or midnight. Kerfonta said that she fell asleep on her side. She felt "somebody pulling down [her] pants." She woke up and saw that it was Ceron. Kerfonta said that Ceron "jumped up and left the room." She immediately told Jose when he came in the room for something: "I think [Ceron] just came in here, because I know it wasn't you." Jose called her a liar.

{¶48} Kerfonta said that about a month later, Ceron apologized to her for what he did. Ceron said, "Kristina, I was drinking. I'm sorry for what happened." Kerfonta

said that she told Ceron, "I don't forgive you, but I don't want your wife to get hurt for this, and I understand. You apologized to Jose. You apologized to me. Just let it go. I don't want to talk about it anymore. * * * Don't let it happen again." Kerfonta never told anyone else about the incident.

{¶49} Jose testified that in December 2010, Kerfonta told him something "about five, ten minutes after it happened." The following day, Ceron apologized to Jose. Ceron told Jose that "he touch improperly Kristina." Ceron told Jose exactly what he did; "[h]e said, Jose, I'm sorry. I know it was wrong. I touch Kristina. I tried to pull her pants down, but then I left." Ceron also asked Jose, "in some words," to "keep it quiet."

{¶50} The jury found Ceron guilty of all three offenses as charged: rape with the furthermore clause that the victim was under ten years of age, gross sexual imposition of a victim under the age of 13 years old, and kidnapping with the sexual motivation specification. The trial court merged all of the offenses. The state elected to proceed on the rape offense. The trial court sentenced Ceron to life in prison with parole eligibility after 25 years. The trial court further notified Ceron that he would be labeled a Tier III sex offender.

{¶51} We will address Ceron's assignments of error out of order for ease of discussion.

<u>Hearsay Testimony</u>

**{¶52}** In his second assignment of error, Ceron argues that the trial court erred by admitting hearsay testimony of the victim through the SANE nurse.

**{¶53}** Ceron concedes that his counsel did not object to the SANE nurse's testimony regarding X.H.'s statement. Accordingly, we review for plain error. Under Crim.R. 52(B), plain errors affecting substantial rights may be noticed by an appellate court even though they were not brought to the attention of the trial court. To constitute plain error, there must be: (1) an error, i.e., a deviation from a legal rule, (2) that is plain or obvious, and (3) that affected substantial rights, i.e., affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240 (2002). Even if the error satisfies these prongs, appellate courts are not required to correct the error. Appellate courts retain discretion to correct plain errors. *Id.* Courts are to notice plain error under Crim.R. 52(B), "'with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice.'" *Id.* (citation omitted).

**{¶54}** Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Evid.R. 801(C). Pursuant to Evid.R. 802, hearsay is inadmissible unless it falls within an exception provided by the rules of evidence.

**{¶55}** Evid.R. 803(4) allows, as an exception to the hearsay rule, the admission of "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or

general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The staff notes to the rule provide in pertinent part:

> The circumstantial guaranty of trustworthiness of this exception is derived from the assumption that a person will be truthful about his physical condition to a physician because of the risk of harmful treatment resulting from untruthful statements. * * * The exception is limited to those statements made by the patient which are reasonably pertinent to an accurate diagnosis and should not be a conduit through which matters of no medical significance would be admitted.

Staff Notes to Evid.R. 803(4).

{¶56} As expressed by the Ohio Supreme Court: "The test under Evid.R. 803(4) goes solely to whether a statement was made for purposes of medical diagnosis or treatment. If a statement is made for purposes of diagnosis or treatment, it is admissible pursuant to Evid.R. 803(4)." *State v. Dever*, 64 Ohio St.3d 401, 414, 1992-Ohio-41, 596 N.E.2d 436.

{¶57} In *State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, the court explained at ¶ 42:

> In sexual assault cases such as the case at bar, there is often testimony from a sexual assault nurse. Similar to the dual role of a social worker interviewing a child who may be a victim of sexual abuse, these nurses often perform a dual role involving both medical diagnosis and treatment and the investigation and gathering of evidence. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33, 933 N.E.2d 775 (acknowledging the dual role of the social worker in interviewing a child who may be a victim of sexual abuse from both an investigatory and medical perspective). Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *See Arnold* at ¶ 28; *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, ¶ 47, 875 N.E.2d 944. Accordingly, the salient inquiry when determining whether a hearsay statement is admissible under Evid.R. 803(4), is whether the statement was made for purposes of diagnosis or treatment rather than for

some other purpose. *See Muttart* at ¶ 47. One such "other purpose" is the gathering of forensic information to investigate and potentially prosecute a defendant. *Arnold* at ¶ 33. To the extent that a victim's statement to a nurse is for investigative purposes in furtherance of such criminal prosecution, the statements will not fall within the hearsay exception under Evid.R. 803(4).

**{¶58}** In this case, the SANE nurse, Michele Reali-Sorrell, testified that as a sexual assault nurse examiner, she examines victims, obtains a history and a physical, and "looks for injuries." She further explained that "[w]e medically treat them, make any diagnosis, and refer them to a physician for more examination." Reali-Sorrell testified that she obtains a history "so we know how to medically treat them and diagnose what's wrong."

**{¶59}** Reali-Sorrell testified that X.H. told her: "I was sitting on the couch at my aunt's house. Wicho sat next to me on the couch. He pulled my pants down, and he touched my privates, he put his finger in me. He got on top of me. My dad walked in, and he got up and said goodbye."

**{¶60}** After review, we conclude that X.H.'s statement — a statement by a five-year-old child — was for the purpose of medical diagnosis and treatment. Therefore, it was admissible hearsay. *See also State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, ¶ 56 (Lanzinger, J., dissenting) ("[i]t is reasonable to suppose" that "any statements" made by child assault victims — "from a child's point of view, * * * were solely for medical diagnosis and treatment.").

**{¶61}** Ceron concedes that "[b]ecause [X.H.] testified at trial, the admission of her statement to the nurse claiming penetration would not ordinarily present a constitutional

violation." But he argues that "[u]nder the unique circumstances of this case," his rights to due process were violated. In support of this argument, he claims that although X.H. testified, she was never questioned about the statement, much less asked to defend or explain it. He further claims that X.H. could not be "confronted over it due to the fact that her testimony had concluded before the admission of the statement." Ceron's arguments are completely unfounded. He had every opportunity to cross-examine the victim in any way that he wished (he had a copy of the SANE nurse's report prior to trial). But he chose not to.

**{¶62}** Further, Ceron's argument claiming that Reali-Sorrell's testimony improperly impeached X.H.'s is completely unfounded and bordering on outrageous.

**{¶63}** Accordingly, we find no error, plain or otherwise. Ceron's second assignment of error is overruled.

### Other-Acts Evidence

**{¶64}** In his first assignment of error, Ceron argues that the trial court erred when it permitted the prosecution, over his objection, to present other-acts evidence under Evid.R. 404(B) through two rebuttal witness, Kerfonta and Jose. Kerfonta and Jose testified that in December 2010, Ceron, who had been drinking, attempted to pull Kerfonta's pants down while she was sleeping. Ceron maintains that this evidence was inadmissible evidence under Evid.R. 404(B) because it was offered as propensity evidence, i.e., to prove that when Ceron gets drunk, he has a propensity to pull down the pants of female family members who are sleeping.

**{¶65}** The state argues that it offered the testimony of Kerfonta and Jose to demonstrate the motive, scheme, opportunity, and lack of mistake or accident on the part of the accused to target sleeping female family members, in the home, while others are present to interrupt or discover appellant's sexual activity of pulling down the female's pants (multiple females: [Kerfonta] and X.H.) for the purpose of sexual conduct and/or gratification.

A.     Standard of Review

**{¶66}** In *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, the Ohio Supreme Court set forth a reviewing court's standard of review regarding the admissibility of other-acts evidence under Evid.R. 404(B).   The high court held at ¶ 14:

> "The admission of such [other-acts] evidence lies within the broad discretion of the trial court, and a reviewing court should not disturb evidentiary decisions in the absence of an abuse of discretion that created material prejudice."   *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 66.   *See also State v. Sage*, 31 Ohio St.3d 173, 510 N.E.2d 343 (1987), paragraph two of the syllabus ("The admission or exclusion of relevant evidence rests within the sound discretion of the trial court").   "Abuse of discretion" has been described as including a ruling that lacks a "sound reasoning process."   *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990).   A review under the abuse-of-discretion standard is a deferential review.   It is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments. *Id.*

B.     Evid.R. 404(B) and R.C. 2945.59

**{¶67}** "Evidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character." *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15, citing *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975); *State v. Jamison*, 49 Ohio St.3d 182, 184, 552 N.E.2d 180 (1990). In R.C. 2945.59, however, the General Assembly "codified certain exceptions to the common law regarding the admission of evidence of other acts of wrongdoing." *Id.* This statute provides that:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶68}** Evid.R. 404(B) is "in accord with R.C. 2945.59," but some differences do exist. *Williams* at ¶ 16-17. Evid.R. 404(B) provides that

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶69}** The Ohio Supreme Court explained that "[t]he statute affords the trial court discretion to admit evidence of any other acts of a defendant in cases where motive or

intent, absence of mistake or accident, or scheme, plan, or system in doing an act is material." *Id.* at ¶ 17. "[M]aterial" means "[h]aving some logical connection with the consequential facts." *Id.* at ¶ 17, citing *Black's Law Dictionary* 1066 (9th Ed.2009). But Evid.R. 404(B) contains no reference to materiality. Thus, Evid.R. 404(B) "affords the trial court discretion to admit evidence of other crimes, wrongs, or acts for 'other purposes,' including, but not limited to, those set forth in the rule. Hence, the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." *Id.*

{¶70} In determining whether to permit other-acts evidence to be admitted, trial courts should conduct a three-step analysis set for in *Williams* at ¶ 20: (1) determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401; (2) determine if the other acts "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)"; and (3) consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice."

C.   Pertinent Procedural History in the Present Case

{¶71} Prior to trial, the state filed a notice of intent to use Evid.R. 404(B) evidence of prior acts, which Ceron opposed. The court held a hearing on the issue before trial. The state informed the court that it was seeking to introduce other-acts evidence that

Ceron, after he had been drinking, attempted to pull Kerfonta's pants down while she was sleeping. The state argued that "[t]he prior scheme and plan here is significant" because "[t]hese are both female family members who are asleep and the defendant tries to take advantage of that." Ceron responded that it was improper evidence. The trial court held its ruling in abeyance and ordered the parties not to mention the issue at trial.

{¶72} When Ceron testified on cross-examination, the state began by asking him if he had been drinking on the night of August 25, 2012. Ceron replied that he had. The state then asked, "[a]nd isn't it true that you tend to get in trouble when you drink?" Ceron replied that he gets into trouble if he leaves his house, but not if he stays at home. The state followed up with the question: "But you have gotten in trouble when you've been drinking in the past, haven't you?" Defense counsel objected.

{¶73} At a sidebar, defense counsel argued that the only possible other-acts evidence that could be brought in at that point was a misdemeanor DUI conviction. The state countered that Ceron placed his character at issue when he and the other defense witnesses testified. The state argued that it was relevant to Ceron's character to "give the full picture" of what Ceron does when he is drinking, "such as pulling down the pants of a six-year old." The court asked the state, "do you have evidence that when he drinks he gets into trouble?" The state responded that Ceron had a prior DUI conviction. The state then brought up its "404(B) motion." The court asked the state if it intended to go into that evidence at that point. The state replied that it was going to ask Ceron "the question" but not "about who specifically."

**{¶74}** The court indicated that it had reviewed *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, and was familiar with the three-part test set forth in that case. The court then recited the parameters of the three-part test, without providing any analysis specific to this case, and concluded that it would allow the other-act testimony to be admitted.

**{¶75}** Defense counsel objected. The state responded again that Ceron put his character at issue, therefore the state should be able to question him on it. The state argued that if Ceron was going to "parade in how many more character witnesses and talk about what a great guy he is, then the state should be permitted to ask about the DUI and the choices he makes when he's drinking." The state informed the trial court that upon continuing its cross-examination of Ceron, it did not yet know if it would call Kerfonta and Jose back to the stand to testify to the other acts, but the state wanted to question Ceron about the other acts. The trial court permitted the state to do so.

**{¶76}** The state continued its cross-examination of Ceron. It asked Ceron again, "it's true that you tend to get in trouble when you're drinking?" Ceron replied that "[o]ne time I have a problem." The state then asked, "And isn't it true that after drinking you've been accused of pulling down the pants of other females?" Over defense counsel's objection, Ceron replied, "no." The state continued questioning Ceron about other matters.

**{¶77}** At the close of Ceron's case-in-chief, the state indicated that it intended to call two rebuttal witness, Kerfonta and Jose. The state explained that "this testimony

only pertains — is for the limited purposes of the 404(B)." The court was concerned that Kerfonta and Jose had been sitting in the courtroom since they testified and there had been a separation of witnesses. The state assured the trial court that Kerfonta and Jose would only testify to the "404(B) matter" and that it would only be for the purpose of offering rebuttal evidence. The court ruled that the state could place the rebuttal witnesses back on the stand "for the limited purpose of 404(B), not for any testimony, anything that was said during the defense case in regards to any specific issues."

{¶78} The jury came back into the courtroom. The court instructed the jury:

The state is calling this rebuttal witness at this time. The state is calling this rebuttal witness for the purpose of something called other acts.

Evidence will be received about the commission of other acts other than the offense with which this defendant is charged in this trial. This evidence will be received for only a limited purpose. It is not received, and you may not consider it, to prove the character of the defendant in order to show that he acted in conformity or accordance with that character.

If you find that this evidence of other acts is true and that the defendant committed them, you may consider this evidence only for the purpose of deciding whether it proves, A, the absence of mistake or accident; or, B, the defendant's motive, opportunity, intent; or, C, purpose, preparation, or plan to commit the offense charged in this trial, or knowledge of circumstances surrounding the offense charged in this trial; or, D, the identity of the person who committed the offense in this trial.

That evidence cannot be considered for any other purpose.

{¶79} The state then questioned Kerfonta and Jose about Ceron attempting to pull Kerfonta's pants down while she was sleeping after he had been drinking. Before the jury began its deliberations, the court read the instruction on other-acts evidence to the jury again as part of the jury instructions.

D.       *Williams* Three-Part Test Applied in This Case

        1.       *Relevancy*

**{¶80}** The first step of the *Williams* test is to determine if the other acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401. *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.   As stated by Evid.R. 402, "[a]ll relevant evidence is admissible" and "[e]vidence which is not relevant is not admissible."

**{¶81}** Regarding the first step of the *Williams* test, the state's argument mirrors the analysis set forth by the Ohio Supreme Court.   The state maintains that the other-acts evidence "was relevant because it tended to show the motive that [Ceron] had, the scheme he exhibited of targeting sleeping female family members."   The state argues that if this evidence is believed by the jury, "such testimony could corroborate the testimony of X.H."   The state further argues that this evidence was relevant to prove lack of mistake, because Ceron first told Jose that he may have "accidentally touched" X.H. when he sat down.   The state further contends that the other-acts evidence was relevant to show opportunity because at trial, Ceron argued that he was in the house for such a short time, that he did not have time to pull X.H.'s pants down and digitally penetrate her.

**{¶82}** In *Williams*, the other-acts evidence indicated that the defendant had targeted young, fatherless males "to gain their trust and confidence and groom them for sexual activity with the intent of sexual gratification."   *Id.* at ¶ 25.   Williams befriended

the victim, often bought him gifts, and paid him to do odd jobs at Williams's house. The other-act evidence showed that Williams had "exhibited a pattern of isolating certain types of victims and then abused a position of authority to engage in grooming behaviors for the purpose of sexual gratification[.]" *Id.* at ¶ 11. Further, Williams argued at trial that he was only sexually attracted to women. The Supreme Court held that the other-act evidence tended to prove that Williams derived sexual gratification from engaging in sexual relations with teenage boys and that he had a certain plan or method of targeting a certain group of victims by gaining their trust through the role of an authority figure before abusing them. *Id.* at ¶ 25.

{¶83} We find, however, that the facts in *Williams* are distinguishable from the facts in this case. As the court in *State v. Morris*, 9th Dist. Medina No. 09CA0022-M, 2012-Ohio-6151,[1] explained: "there is a fundamental difference between a man's desire to engage in sexual activity with his wife's adult daughter and his desire to rape his wife's little girl [who was entering the second grade when the sexual abuse started]." In

---

[1] The Ninth District's original decision in this case, *State v. Morris*, 9th Dist. Medina No. 09CA0022-M, 2010-Ohio-4282, was reversed by the Ohio Supreme Court. *See State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528. The Ninth District, conducting a de novo review, had held that the trial court erred by admitting other-acts evidence and it further held that it was not harmless error. The Supreme Court concluded that the Ninth District erred when it applied a de novo standard of review when analyzing other-acts evidence; the high court held that the standard of review is abuse of discretion. *Id.* at ¶ 23. The Supreme Court reversed for application of the abuse-of-discretion standard of review. *Id.* Upon remand, the Ninth District found that the trial court abused its discretion by permitting the other-acts evidence. *Morris*, 2012-Ohio-6151, ¶ 40. As of June 2013, the 2012 *Morris* decision is now pending on appeal again at the Ohio Supreme Court. *See State v. Morris*, 136 Ohio St.3d 1406, 2013-Ohio-2645, 989 N.E.2d 102. The sole issue on appeal is whether the erroneous admission of other-acts evidence mandates that the court apply a constitutional harmless error standard, or a nonconstitutional harmless error standard.

*Morris*, the trial court permitted the state to introduce other-acts testimony from the victim's sister, Sarah, who was seven years older than the victim. Sarah testified that she was an adult and had previously been married, but was back living with her mother, her younger sister, and Morris, when Morris sexually propositioned her by pulling her on the bed and telling her, "you don't know what I would do to you but your mother would get mad." *Id.* at ¶ 14. That was the extent of the proposition. The next day the defendant apologized to Sarah, and he never propositioned her a second time. The Ninth District reasoned that

> [o]ne cannot reasonably conclude that the evidence offered by Sarah has any tendency to prove that Mr. Morris engaged in a similar plan or method of conduct with the two sisters or that his alleged conduct with Sarah has some tendency to prove his motive or intent on certain occasions to derive sexual gratification from a child.

*Id.* at ¶ 28.

{¶84} Although the facts in *Morris* are not directly on point to the present (because the defendant in that case vaginally raped the victim at least ten times from second grade until she was 13), we find it to be instructive here. Similarly, in the present case, the state is arguing that evidence of Ceron attempting to pull Kerfonta's pants down while she was sleeping is relevant to establishing that Ceron also pulled X.H.'s pants down while she was sleeping and digitally penetrated her. We disagree with the state that Ceron attempting to pull the pants down of an adult makes it more probable that he also pulled the pants down of a five year old, and then went on to rape the five year old.

{¶85} Accordingly, we find that even the first step of the *Williams* test is not met.

2. *Evid.R. 404(B) Factors: Proof of Motive, Opportunity, Intent, Preparation, Plan, Knowledge, Identity, or Absence of Mistake or Accident*

**{¶86}** In the second step of the *Williams* test, courts must determine if the other-acts evidence "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)," including proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. *Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, ¶ 20.

**{¶87}** Regarding this *Williams* parameter, the state contends that it did not offer the other-acts evidence "to show that abusing X.H. was in conformity with [Ceron's] character." In support of this contention, the state merely claims that the trial court gave the jury two limiting instructions that this evidence was not being offered to prove Ceron's character, and that the jury is presumed to follow these instructions. That is the extent of the state's argument. We note, however, that the state's argument on this parameter also mirrors the Supreme Court's analysis on the same parameter in *Williams*. Regarding this second parameter, the Supreme Court stated in *Williams*:

> The next step relates to whether the evidence is presented to prove the accused's character in order to show that the conduct was in conformity with that character. In this case, contrary to the view expressed by the court of appeals, the state did not offer the evidence of the Williams-A.B. relationship to show that abusing J.H. was in conformity with Williams's character. In fact, the trial court gave two limiting instructions that this evidence was not being offered to prove Williams's character — one just prior to the testimony of A.B., and one prior to deliberation. We presume the jury followed those instructions. *See State v. Garner*, 74 Ohio St.3d

49, 59, 656 N.E.2d 623 (1995); *Pang v. Minch*, 53 Ohio St.3d 186, 195, 559 N.E.2d 1313 (1990).

*Williams* at ¶ 23.

{¶88} In *Williams*, however, the other-acts evidence of Williams's conduct with the prior victim paralleled his conduct with the victim he was currently accused of sexually abusing. In both incidents, Williams had targeted teenage males who had no father figure in order to gain their trust and confidence and groom them for subsequent sexual activities. Based on these facts, the Supreme Court determined that evidence of Williams's prior conduct "tended to show the motive Williams had and the preparation and plan he exhibited of targeting, mentoring, grooming, and abusing teenage boys." *Williams* at ¶ 22. "Evidence that Williams had targeted teenage males who had no father figure to gain their trust and confidence and groom them for sexual activity with the intent of sexual gratification may be admitted to show the plan of the accused and the intent for sexual gratification." *Id*. at ¶ 25.

{¶89} In sharp contrast here, Ceron's conduct in both incidents hardly constituted a unique behavioral footprint. Kerfonta was an adult with three young children. X.H. was a five-year-old little girl. Again, there is a "fundamental difference" between a man desiring to engage in sexual activity with an adult, whether appropriate or not, and desiring sexual contact with a very young child. The fact that Ceron was drunk each time, and both females were sleeping, does nothing to change this analysis.

{¶90} We further disagree with the state that evidence of Ceron attempting to pull Kerfonta's pants down proves a scheme of "targeting sleeping female family members."

In no way does this evidence corroborate the testimony of X.H. The state's other arguments that this evidence could also be admitted to show lack of mistake and opportunity are also completely illogical.

**{¶91}** Regarding mistake, Ceron's defense at trial was that he did not do it. Just because Jose testified to hearsay evidence that Ceron told him that he may have "accidentally touched" X.H. is of no consequence to this analysis. Ceron testified that he did not touch X.H. Lack of mistake is just not at issue in this case. And the state's argument that attempting to pull Kerfonta's pants down shows that Ceron had "opportunity" to also pull X.H.'s pants down and rape X.H. is simply without reason. Kerfonta's rebuttal testimony had no tendency to prove that Ceron had an "opportunity" to rape X.H.

**{¶92}** The only plausible use for the rebuttal evidence presented by Kerfonta and Jose was to draw an impermissible character inference that is forbidden by Evid.R. 404(B), i.e., to show that Ceron is the *type* of sexually perverted man who would like to engage in sexual activity with his daughter-in-law and, therefore, is likely to have raped his granddaughter on the night in question. *See Morris*, 9th Dist. Medina No. 09CA0022-M, 2012-Ohio-6151, at ¶ 33. Accordingly, we conclude that the second test of *Williams* also fails.

### 3. *Probative Value and Unfair Prejudice*

**{¶93}** The third parameter requires courts to consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice"

under Evid.R. 403(A). *Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, at ¶ 20.

**{¶94}** The state maintains that this evidence was not unduly prejudicial — again because the trial court gave two limiting instructions to the jury, which the state claims "lessened the prejudicial effect of the 404(B) testimony, and corroborated X.H.'s testimony about the sexual abuse, which had been denied by appellant."

**{¶95}** But since we have determined that the evidence has no probative value, we need not address this parameter.

**{¶96}** In sum, we conclude that the trial court abused its discretion when it permitted the state to introduce other-acts evidence through rebuttal. There is simply no "sound reasoning" that could justify its admission. *See Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14.

E.    *Harmless Error Analysis*

**{¶97}** Despite finding that the trial court erroneously admitted the other-acts evidence, we must determine if the error was harmless. Pursuant to Crim.R. 52(A) any error, defect, irregularity, or variance that does not affect a substantial right will be disregarded. *See also State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 88 (applying nonconstitutional harmless-error analysis to erroneous admission of other acts evidence); *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, 848 N.E.2d 810, ¶ 74 (same). A nonconstitutional error is harmless

when there is substantial other evidence to support the guilty verdict. *State v. Webb*, 70 Ohio St.3d 325, 335, 638 N.E.2d 1023 (1994).

{¶98} After review, we find that the error was harmless. The state presented evidence — through X.H.'s testimony — that Ceron "touched [her] privacy" with his fingers, "went on top of [her]," and "touched [her] privacy again." X.H. testified that when her grandfather did this, it "hurted" because "he pushed his fingers really down." X.H. demonstrated to the jury, on an anatomically correct doll, how Ceron "touched her privacy." The state indicated for the record that X.H. "pressed two fingers to the center of the middle of the doll." X.H. also testified that where she put her fingers on the doll was what she called "privacy."

{¶99} When X.H. got up the next morning, she first told her father what happened and then her aunt. The following day, she essentially told the SANE nurse the same thing that she testified to: "I was sitting on the couch at my aunt's house. Wicho sat next to me on the couch. He pulled my pants down, and he touched my privates, he put his finger in me. He got on top of me. My dad walked in, and he got up and said goodbye."

{¶100} Further, there is nothing in the record that calls X.H.'s credibility into question. Before the incident of sexual abuse, each witness testified that X.H. loved her grandfather and had a close relationship with him.

{¶101} Moreover, the DNA test results from the Y-STR analysis indicated that Ceron's DNA could not be excluded from the swabs taken from the "crotch" of X.H.'s

underwear that she was wearing that night. The forensic DNA analyst who performed the Y-STR analysis testified that there was DNA present in the "crotch" of X.H.'s underwear from three males. She explained that DNA can transfer to another person or item by simply touching the item or person. She further explained that she looked at "17 locations," and on every location, she found that "sample item 3," which was the swab from Ceron, was present at all 17 locations. She explained that if only one of these locations did not include Ceron's DNA, she could have excluded him.

{¶102} Thus, we conclude that the admission of the other-acts evidence was harmless as there was substantial other evidence to support the guilty verdict.

{¶103} Ceron's first assignment of error is overruled.

### Prosecutorial Misconduct

{¶104} In his third assignment of error, Ceron maintains that during the prosecutor's closing arguments, she committed prosecutorial misconduct by mischaracterizing the victim's and Kerfonta's testimony.

{¶105} The standard of review for prosecutorial misconduct is whether the comments and questions by the prosecution were improper, and, if so, whether they prejudiced appellant's substantial rights. *State v. Treesh*, 90 Ohio St.3d 460, 480, 739 N.E.2d 749 (2001). Prosecutorial misconduct will not provide a basis for reversal unless the misconduct can be said to have deprived the appellant of a fair trial based on the entire record. *State v. Lott*, 51 Ohio St.3d 160, 166, 555 N.E.2d 293 (1990). "The touchstone of analysis 'is the fairness of the trial, not the culpability of the prosecutor.'"

*State v. Gapen*, 104 Ohio St.3d 358, 2004-Ohio-6548, 819 N.E.2d 1047, ¶ 92, quoting *Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

{¶106} But in this case, Ceron did not object to the prosecutor's statements. Therefore, he has waived all but plain error. *State v. Bryan*, 101 Ohio St.3d 272, 2004-Ohio-971, 804 N.E.2d 433, ¶ 175; *State v. Ballew*, 76 Ohio St.3d 244, 254, 667 N.E.2d 369 (1996). The plain error rule is to be invoked only under exceptional circumstances in order to avoid a manifest miscarriage of justice. *State v. Long*, 53 Ohio St.2d 91, 95, 372 N.E.2d 804 (1978). Plain error does not occur unless, but for the error, the outcome of the trial clearly would have been different. *Id.* at 97; Crim.R. 52(B).

{¶107} Ceron points to three of the prosecutor's comments during closing arguments. First, Ceron argues that during closing arguments, the prosecutor described X.H.'s actions with the doll as: "[S]he demonstrated that two fingers were put *in* [sic] her privacy." But he claims that earlier, the prosecutor had characterized the demonstration as: "pressed two fingers to the center of the doll."

{¶108} Next, Ceron argues that the prosecutor's comment describing Kerfonta's actions in taking X.H. to the hospital was not testimony that was offered at trial. Specifically, the prosecutor stated, "Ask yourself this: Your child comes to you, and she says, someone pulled down my pants and touched my privacy. He put his fingers in me."

{¶109} Ceron further argues that the prosecutor mischaracterized X.H.'s statement: "he pushed his fingers really down, and it hurts," as "it hurted, that it hurted, and he pushed down with his fingers *in* her privacy." (Emphasis sic.)

{¶110} Ceron argues that "the alleged victim never testified that appellant put his fingers inside her, but the prosecutor twice characterized her testimony that way." Ceron further maintains that "even worse" than that, the prosecutor "testified *for* [sic] Kerfonta," telling the jury to imagine you were in Kerfonta's shoes and "your child says * * * he put his fingers in me." Ceron claims that "[t]he repeated, intentional, and outrageous misconduct by the prosecutor altered and mischaracterized the trial record, and caused dire prejudice to [his] fundamental constitutional rights."

{¶111} A prosecutor has wide latitude to comment on the evidence of record, and may suggest conclusions based on that evidence in a closing argument. *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 149. Indeed, a prosecutor may comment in closing argument regarding "'what the evidence has shown and what reasonable inferences [the prosecutor] believes may be drawn therefrom.'" *State v. Lott*, 51 Ohio St.3d 160, 165, 555 N.E.2d 293 (1990), quoting *State v. Stephens*, 24 Ohio St.2d 76, 82, 263 N.E.2d 773 (1970); *State v. Tufts*, 8th Dist. Cuyahoga No. 94276, 2011-Ohio-73, ¶ 23. Although prosecutors are entitled to considerable latitude in opening and closing arguments, they must nevertheless avoid insinuations and assertions calculated to mislead. *Lott* at 166. Courts must review the statement within the context of the entire trial. *State v. Bailey*, 8th Dist. Cuyahoga No. 97329, 2012-Ohio-3447, ¶ 12.

{¶112} After reviewing the prosecutor's comments within the context of the entire trial, we cannot say that they were improper. The jury heard X.H.'s testimony that Ceron "touched her privacy." The jury heard the SANE nurse testify as to X.H.'s verbatim statement — where X.H. expressly told the nurse that Ceron "put his finger in me." The jury also heard X.H. testify that when Ceron "touched her privacy," it "hurted" because he "pushed his fingers really down." And the jury observed X.H. demonstrate what Ceron did to her on the anatomically correct doll. Further, during closing arguments, in addition to the three comments that Ceron complains of, the prosecutor stated *seven times* that the victim said that Ceron "touched [her] privacy." Thus, we simply do not find that the prosecutor's comments amounted to "insinuations" or were "calculated to mislead."

{¶113} Even if we were to find that the prosecutor's comments were improper, they still would not rise to the high level of plain error. Stated another way, this is not such a case where a manifest miscarriage of justice would occur if we did not invoke the plain error rule because of the three comments made by the prosecutor in closing arugments.

{¶114} Ceron's third assignment of error is overruled.

### Sufficient and Manifest Weight of the Evidence

{¶115} Ceron argues his fourth (sufficiency and manifest weight arguments) and fifth (Crim.R. 29 motion) assignments of error together "due to the similarity of their standards for evaluation." Thus, we will also address them together.

**{¶116}** When an appellate court reviews a record upon a sufficiency challenge, "'the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When reviewing the denial of a Crim.R. 29 motion, it is identical to reviewing whether the evidence was legally sufficient to sustain the defendant's convictions. *State v. Tenace*, 109 Ohio St.3d 255, 260, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

**{¶117}** In contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. When reviewing a claim challenging the manifest weight of the evidence, "the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). After reviewing the entire record, the reviewing court must

> weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*Id.*

**{¶118}** In his sufficiency and Crim.R. 29 arguments, Ceron only argues one element of his rape conviction — penetration. In so arguing, however, he admits that

there was some evidence of penetration — through the SANE nurse's testimony. Because we found that it was proper for the trial court to admit the SANE nurse's testimony, there was sufficient evidence of penetration. Thus, the trial court did not err when it denied Ceron's Crim.R. 29 motion.

{¶119} Regarding manifest weight of the evidence, Ceron argues that because the SANE nurse's testimony was the only evidence of penetration, it goes against the manifest weight of the evidence "because the victim unequivocally testified against penetration." He also argues that "[t]he victim's testimony was not more credible than the contradictory testimony of the defense's witnesses." Further, he maintains that the victim's version of the events was inconsistent.

{¶120} After following our standard of review set forth in *Thompkins*, we cannot say that Ceron's convictions were against the manifest weight of the evidence. It must be emphasized that the trier of fact is in the best position to evaluate testimony and resolve inconsistencies, if any, by observing the witness's manner and demeanor on the witness stand — attributes impossible to glean through a printed record. *See State v. Habo*, 11th Dist. Portage No. 2012-P-0056, 2013-Ohio-2142, ¶ 28. In this case, the jury was faced with opposing versions of the events. As the triers of fact, they were free to believe all or part of any witnesses' testimony. Apparently they found X.H. more credible than Ceron and his witnesses, and they were free to do so. This court may reverse a conviction and order a new trial only in the exceptional case where the evidence

weighs heavily in favor of the defendant and where it is clear that the jury lost its way or created a manifest miscarriage of justice.    This is not such a case.

{¶121} Accordingly, Ceron's fourth and fifth assignments of error are overruled.

Cumulative Error

{¶122} In his sixth assignment of error, Ceron argues that he was denied a fair trial by virtue of the cumulative effect of the errors committed during his trial.   We disagree.

{¶123} Pursuant to the cumulative-error doctrine, the existence of multiple errors, which may not individually require reversal, may violate a defendant's right to a fair trial.  *State v. Madrigal*, 87 Ohio St.3d 378, 397, 721 N.E.2d 52 (2000), citing *State v. DeMarco*, 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987).   To find cumulative error, we must first find multiple errors committed at trial and determine that there is a reasonable probability that the outcome below would have been different but for the combination of the harmless errors.   *State v. Cox*, 2d Dist. Montgomery No. 25477, 2012-Ohio-4941, ¶ 91.

{¶124} Because we have found no error in any of Ceron's assignments of error, there cannot be cumulative error.   Ceron's sixth assignment of error is overruled.

{¶125} Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.   The defendant's conviction having

been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

_____
MARY J. BOYLE, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., CONCURS;
LARRY A. JONES, SR., J., DISSENTS WITH SEPARATE OPINION


LARRY A. JONES, SR., J., DISSENTING:

{¶126} I respectfully dissent. I agree with the majority's excellent analysis of the other-acts evidence the trial court allowed into evidence and likewise conclude that the trial court erred in its admission pursuant to *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278.

{¶127} I cannot find, however, that the admission of the other-acts evidence was harmless error. If there is no reasonable possibility that the improper other-acts evidence contributed to a defendant's conviction, then its admission is harmless error. *State v. Elliot*, 91 Ohio App.3d 763, 771, 633 N.E.2d 1144 (3d Dist.1993).

{¶128} The danger that a jury will convict a defendant because it assumes that the defendant has a propensity to commit criminal acts, or deserves punishment regardless of whether he committed the crime charged in the indictment is particularly high when the other acts are very similar to the charged offense or of an inflammatory nature. *State v.*

*Morris*, 9th Dist. Medina No. 09CA0022-M, 2012-Ohio-6151, ¶ 56, *discretionary appeal allowed*, 136 Ohio St.3d 1406, 2013-Ohio-2645, 989 N.E.2d 1021, citing *State v. Miley*, 5th Dist. Richland Nos. 2005-CA-67 and 2006-CA-14, 2006-Ohio-4670, ¶ 58. "Sexually deviant acts, especially those against children, carry a severe social stigma, leading to an increased risk that other sexually deviant acts by the defendant will influence a jury to convict because it assumes the defendant is a bad man." *Morris* at *id.*

{¶129} In this case, the state used improperly admitted evidence to attempt to persuade the jury to "make the very leap in logic that is forbidden by Rule 404(B) of the Ohio Rules of Evidence," that is if Ceron is the type of man who would be willing to cross a moral boundary with his granddaughter's adult mother, then the jury should also believe he is the type of person who would   rape his young granddaughter.  *Morris* at ¶ 58, citing *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994).   The majority acknowledges this fault, yet determines that the error was harmless.   I cannot, however, agree that there was no reasonable possibility that the Evid.R. 404(B) testimony did not contribute to Ceron's conviction or that the error was harmless beyond a reasonable doubt.   *Miley* at ¶ 76; *see also State v. Rahman*, 23 Ohio St.3d 146, 151, 492 N.E.2d 401 (1986).

{¶130} Accordingly, I would sustain the first assignment of error and remand for a new trial.