[Cite as *State v. Terry*, 2014-Ohio-4804.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 100813**

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**CAMILIA TERRY**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-12-569331-A

**BEFORE:** Kilbane, J., S. Gallagher, P.J., and Rocco, J.

**RELEASED AND JOURNALIZED:** October 30, 2014

**ATTORNEY FOR APPELLANT**

Thomas A. Rein
526 Superior Avenue
Leader Building
Suite 940
Cleveland, Ohio 44114

**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
Anna M. Faraglia
Ronni Ducoff
Assistant County Prosecutors
The Justice Center - 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

MARY EILEEN KILBANE, J.:

{¶1} Defendant-appellant, Camilia Terry ("Terry"), appeals her convictions. For the reasons set forth below, we affirm.

{¶2} In December 2012, Terry was charged in a ten-count indictment. Counts 1 and 2 charged her with the aggravated murder. Counts 3 and 4 charged her with murder. Count 5 charged her felonious assault. Counts 6 and 7 charged her with child endangering. Count 8 charged her with tampering with evidence. Count 9 charged her making false alarms, knowing that said conduct resulted in economic harm of $7,500 or more, but less than $150,000. Count 10 charged Terry with gross abuse of a corpse. All of the charges stem from the tragic death of Terry's three-year-old son, Emilliano Terry ("Emilliano").

{¶3} In November 2013, the matter proceeded to a jury trial, at which the following evidence was adduced.

{¶4} On November 25, 2012, at 5:08 p.m., Cleveland police received a call from Terry stating that her three-year-old son, Emilliano, was missing. Terry stated that she was at Kossuth Park, located near the intersection of East 121st Street and Shaker Boulevard in Cleveland. Cleveland Police Officer Robert Mangan ("Mangan") and his partner Officer Kevin Walker ("Walker") immediately responded to the scene. They arrived within minutes of Terry's call. Upon arrival, Mangan observed Terry standing in the park with two small children, later identified as her five-year-old son, K.T., and five-month-old son, R.T. The officers asked Terry for any additional details that might assist them in their search for Emilliano. Kossuth Park is very small in size and surrounded by a fence. Once the officers determined that Emilliano was not in the park, they split up and searched nearby apartment buildings and surrounding side streets. Mangan returned to Terry approximately five minutes later to gather more information

that would assist in the search process.

{¶5} Terry told Mangan that K.T. observed Emilliano get into a black car. Terry never gave him a clear answer as to when K.T. told her that information. Mangan then spoke to K.T., but was unable to gather additional information related to the black car. Terry stated that she also observed the black car, but she did not observe Emilliano enter the vehicle. Mangan testified that Terry seemed upset, but not hysterical.

{¶6} Mangan relayed the information to his supervisor, Cleveland Police Sergeant Patrick Petranek ("Petranek"), who arrived on the scene shortly thereafter. Petranek instructed Mangan to return Terry and her two children to Terry's apartment at 13008 Buckeye Road in Cleveland. Petranek further instructed Mangan to stay with Terry in her apartment and conduct a more thorough search of her apartment building. While Walker searched the apartment complex, Mangan began to fill out a missing person's report. Mangan stayed with Terry until Cleveland Police Detectives James Brooks ("Brooks") and Michael Hale ("Hale") arrived at Terry's apartment. Once the detectives arrived, Mangan exited Terry's apartment and met up with Walker. The two of them then searched the area surrounding the apartment building, including a back alley that contained a large dumpster. Mangan testified that a dumpster was located directly beneath the back balcony of Terry's apartment.

{¶7} Brooks testified that he and Hale spoke to Terry in her apartment regarding Emilliano's disappearance. Terry told the detectives that after approximately 15 minutes of playing with K.T., she noticed Emilliano was missing. The detectives then walked the route Terry used as she walked to the park that afternoon. Before returning back to Terry's apartment, Cleveland Police Commander Deonne McCaulley and Deputy Chief Calvin Williams instructed the detectives to take Terry and her children back to the Fourth District Precinct for additional

interviews.

{¶8} FBI Special Agent Joseph Callahan ("Special Agent Callahan") testified that the FBI became involved in the search for Emilliano on the evening of November 25, 2012. His personal involvement in the case began on the morning of November 26, 2012. Special Agent Callahan first assessed Kossuth Park and the surrounding area. Special Agent Callahan testified that he then had a conversation with Terry while he was at her apartment building. Law enforcement wished to transport Terry to the local FBI office in order to conduct an interview. Terry was resistant and expressed a desire to speak with her attorney before going to the FBI office for an interview. Terry insisted that she speak to her attorney, so Special Agent Callahan relayed her attorney's contact information to the FBI. Special Agent Callahan then made arrangements for Terry to be transported to the local FBI office.

{¶9} FBI Special Agent Andrew Burke ("Special Agent Burke") testified that he received Terry's consent to search her cell phone. Special Agent Burke generated a report documenting the phone's contents. The report contained text messages, call logs, and other relevant data. Terry told Special Agent Burke that on November 25, 2012, she and her children woke up at approximately 11:00 a.m., and stayed in her apartment until 4:15 p.m. The data extracted from Terry's cell phone, however, placed her phone near Tower City in downtown Cleveland at approximately 2:30 p.m. on the afternoon of November 25, 2012. After being confronted with this information, Terry then stated that she had lunch with her children at the McDonald's in Tower City that afternoon. She further stated they rode a bus downtown at approximately 1:00 p.m.

{¶10} At some point in the investigation, law enforcement determined that Terry had visited other establishments while at Tower City. Shainna Bernard ("Bernard"), an employee of

The Children's Place, a children's clothing store located in Tower City, testified that she returned clothes for Terry on November 25, 2012. Bernard testified that at approximately 2:30 p.m., Terry returned some shirts in size "3T" (Emilliano's clothing size) in exchange for a store credit. Bernard knew Terry through Terry's sister and remembered her from high school. Terry did not disclose this fact to law enforcement during her various interviews.

{¶11} The next day, on November 26, 2012, Special Agent Burke received a still photo from a local business's external surveillance video. The video depicts Terry pushing a stroller past the business. Terry was accompanied by K.T., but the video did not show that Emilliano was with Terry on the afternoon of November 25, 2012. That same day, Terry went to the Cleveland FBI office, where she met with her attorney before being interviewed by FBI Special Agent Lance Fragomeli ("Special Agent Fragomeli"). Prior to her interview, Terry was advised of her rights and signed a *Miranda* waiver, which her attorney initialed.

{¶12} Special Agent Fragomeli testified about his interview with Terry. At first, he questioned Terry about basic biographical information, to which Terry was "very amenable." Special Agent Fragomeli then asked her for information relating to Emilliano's disappearance. Terry stated that she and her three children walked to Kossuth Park at approximately 4:00 p.m. on November 25, 2012. Terry stated that she placed her youngest child, R.T., in a stroller for the walk to the park. She pushed the stroller, while K.T. and Emilliano walked along side her. At some point while they were at the park, Terry stated that she lost sight of Emilliano. She spent approximately fifteen to twenty minutes searching the park for Emilliano before she called her friend, who advised her to call 911. Terry then called 911 and reported that Emilliano was missing.

{¶13} Special Agent Fragomeli then showed Terry the surveillance photo depicting only

K.T. walking to the park with Terry, who was pushing a stroller. Terry responded that Emilliano was hidden behind the stroller because of the camera's angle. Fragomeli told Terry that FBI agents had reviewed the entire video and did not see Emilliano anywhere in the vicinity of the stroller. Terry did not respond to this statement. Special Agent Fragomeli informed Terry that law enforcement spoke with a witness, who observed her on the day of Emilliano's disappearance. That witness had only seen Terry and K.T. walking in the vicinity of Kossuth Park. Emilliano was not present. Terry replied that the witness "must have had something against her."

{¶14} Special Agent Fragomeli also showed Terry a computer printout of an internet posting dated November 21, 2012, stating "I have a three-year-old toddler I want to put up for adoption." Terry admitted that she had created the posting because she had trouble raising Emilliano and was considering giving him up for adoption. The posting states that Terry had hesitations about giving birth to Emilliano, she had difficulty dealing with Emilliano's "problems," and Emilliano's father was not present to assist in raising the child.

{¶15} Special Agent Fragomeli then asked Terry if she could take them to Emilliano's whereabouts. Special Agent Fragomeli stated that it was possible that Emilliano's death was an accident. Terry responded that "she did not appreciate" his implication and asked to leave the room. Terry then left the interview room and Special Agent Fragomeli went back to his desk.

{¶16} After Terry exited the interview room, she was taken into custody by Cleveland police. Terry was *Mirandized* and acknowledged that she understood her rights. As officers were preparing to transport Terry to central booking, Terry stated that she wished to speak to law enforcement and "tell the truth." Terry was then returned to the interview room in which she had previously spoken with Special Agent Fragomeli.

{¶17} Meanwhile, another group of law enforcement officials were searching for Emilliano at the park and Terry's apartment building. FBI Agent Stacy Lough ("Agent Lough") was at Terry's apartment complex, when she was directed by another FBI agent to go speak with the driver of the trash collection truck who retrieved garbage from the dumpster underneath Terry's apartment. Agent Lough asked the driver if they could isolate the trash. The driver referred Agent Lough to his supervisor, Kevin Fitzgerald ("Fiztgerald"). Agent Lough's supervisor spoke with Fitzgerald, who then instructed his driver to return to the waste management facility. Fitzgerald testified that the truck was quarantined in Waste Management Bay 5, and the trash was dumped for law enforcement officials to search.

{¶18} FBI Special Agent Christopher Garnett ("Special Agent Garnett") responded to the waste management facility at approximately 2:15 p.m. on November 26, 2012. Within minutes of searching through the trash, Garnett picked up a garbage bag that felt heavy. He began removing some of the external bags until he reached a blue nylon bag. Special Agent Garnett rolled the contents out of the outer bags and began closely inspecting the object. Special Agent Garnett testified that he felt something that "felt like a skull," and then felt "kneecaps, leg bones, and feet." Special Agent Garnett smelled the stench of decomposition once he cut open the bags.

{¶19} Special Agent Garnett further testified that Emilliano's body was wrapped in approximately seven different plastic bags, including bags from The Children's Place and Target. Once the agents determined that they had found a body, they contacted the Cleveland Police Department and the Medical Examiner's Office. The FBI agents at the waste management facility relayed this information and their discovery of Emilliano's body to the other law enforcement officers interviewing Terry.

{¶20} After receiving notice that Emilliano's body was found, Special Agent Fragomeli, who was again interviewing Terry, informed her that Emilliano's body was discovered. Special Agent Fragomeli told Terry that Emilliano's body had been recovered from a garbage truck that collected trash from her apartment building. Special Agent Fragomeli testified that Terry began to cry and stated that she did not intentionally kill her son. Terry stated that she, K.T., and Emilliano went to sleep in the same bed on the night of November 23, 2012. When she woke up on the morning of November 24, Emilliano was dead. Terry did not know how or why Emilliano stopped breathing. She walked around the apartment for a number of hours, became scared that others would blame her for Emilliano's death, and decided to dispose of Emilliano's body.

{¶21} Terry told Special Agent Fragomeli that she wrapped Emilliano's body in trash bags and The Children's Place shopping bag and placed it in the dumpster by her apartment building. When asked if there were any injuries on Emilliano that she could explain, Terry stated that Emilliano had sustained a head injury the day before when K.T. pushed Emilliano from behind, causing Emilliano to strike his head on a car seat. She stated that Emilliano's head began bleeding and she cleaned up the wound. Terry then wiped the blood off of the car seat.

{¶22} Special Agent Fragomeli drew a diagram detailing the site of Emilliano's injury. Special Agent Fragomeli then wrote a summary of Terry's statement, which Terry certified as an accurate, truthful document by initialing beside each individual bullet point of the summary. Special Agent Fragomeli witnessed the document, and Burke entered into the interview room. Terry then certified the accuracy and truthfulness of Special Agent Fragomeli's summary in Special Agent Burke's presence, and Burke witnessed the document.

{¶23} Andrea Wiens, M.D., ("Dr. Wiens"), a forensic pathologist, performed the autopsy

on Emilliano's body. Dr. Wiens testified that Emilliano was small for his age. His height and weight measurements were below the fifth percentile for his age. Her examination revealed that Emilliano had multiple skull fractures, subgaleal hematomas (bruising underneath the scalp), and lacerations and contusions to his head. Emilliano had intramuscular bruising on the back of his shoulder blades and on the back of his right arm and a laceration to his liver. Dr. Wiens testified that the laceration to his liver almost tore the liver in half and was caused by severe force to his abdomen.

{¶24} Emilliano also had fractures in his left and right ribs, some of which had been sustained at a time prior to Emilliano's death. Dr. Wiens predicted that the old rib fractures occurred sometime during the months preceding Emilliano's death. The remaining described injuries were all inflicted while Emilliano was alive and near the time of his death. Dr. Wiens further testified that, based on the degree of decomposition, Emilliano had been dead for approximately five to seven days prior to the time his body was discovered, making the time of death on or around November 21, 2012. Dr. Wiens testified that the cause of Emilliano's death was blunt impacts to head, torso and extremities with skeletal soft tissue and visceral injuries (injury to the liver and the brain). The manner of Emilliano's tragic death was ruled a homicide.

{¶25} Curtiss Jones ("Jones"), supervisor of the Cuyahoga County Medical Examiner's Office Trace Evidence Department, testified about the evidence obtained in Terry's apartment. He testified that several locations in Terry's apartment tested presumptively positive for blood, including the radiator in the living room, a wall in Terry's front bedroom, and the area surrounding the sink in Terry's kitchen. A pair of Terry's boots also tested presumptively positive for blood. He categorized the blood stains on the radiator as blood splatter. He did not find any indication of blood on the car seat in Terry's car.

**{¶26}** Lisa Moore ("Moore"), a forensic scientist employed with the Cuyahoga County Medical Examiner's Office, testified that she specializes in forensic DNA analysis. She testified that the samples taken from the knot area of the outer bags used to dispose of Emilliano's body matched Terry's DNA. Moore also testified that the blood samples collected from the knot area of the bindings around Emilliano's waist, Terry's boots, and the baseboard in the bedroom all matched Emilliano's DNA.

**{¶27}** Cleveland Police Detective Joselito Sandoval ("Sandoval") testified the he went to the waste management facility with the FBI. He observed trash bags that were opened, partially exposing the right side of Emilliano's face. He viewed three pieces of mail surrounding the body, two of which were addressed to Terry and one letter in Emilliano's name. Sandoval conducted a search of Terry's apartment on November 27, 2012. During the search, he found a letter dated November 21, 2012, from the First Call for Help Community Resources Adoption Network in Cleveland, a Tower City McDonald's receipt dated November 25, 2012, at 2:43 p.m., a HP laptop, two USB drives, and three cell phones belonging to Terry. Sandoval testified that Terry had conducted internet searches on child adoption services around the time of Emilliano's death.

**{¶28}** Sandoval further testified that in October 2013, Terry's attorney contacted him and made arrangements for Terry to give him a statement in the presence of her attorney. Sandoval interviewed Terry on October 21, 2013. During the interview, Terry implicated a male by the name of "Red" as causing Emilliano's death. Terry claimed that sometime before Emilliano's death, "Red" attacked and raped her in her apartment. She said that "Red" attacked her in front of K.T. and Emilliano. According to Terry, K.T. left the room and Emilliano attempted to help her. At that time, "Red" hit Emilliano and then kicked Emilliano down the hallway. Terry told

Sandoval that she then attempted to escape, but "Red" struck her in the head and then raped her. After "Red" left the apartment, Terry found Emilliano asleep in a corner with a lump on his head. Terry told Sandoval that "Red" told her not to implicate him or else he would kill Terry and her children. On Thanksgiving 2012, Terry came back to her apartment to find "Red" sitting in the living room with K.T. and Emilliano. "Red" then took Terry's phone and chased Terry into her bedroom. "Red" was dressed in all black and wore white gloves. "Red" pushed her down onto her bed, inserted a needle into her arm, causing her to lose consciousness, and removed her clothes. When Terry woke up, she found Emilliano in a closet bloody and beaten up with a note pinned to his chest, stating that "[i]f you try to find me I'm going to kill you and your kids." Terry then told Sandoval that she removed Emilliano's dead body from the closet, placed it in trash bags, and placed the bags containing his body in the dumpster behind her apartment building.

{¶29} After Terry's statement, Sandoval began his investigation of her claims. He identified "Red" as Rahsaan Lamar ("Lamar"), who testified at trial. Lamar testified that his nickname is "Red." He admitted to a criminal record, including convictions for robbery and assault. Lamar met Terry in the summer of 2011. At that time, she lived in an apartment in the area of South Moreland and Shaker Roads, which was near his cousin's apartment. He visited her at this apartment on two occasions. On the first occasion, Lamar was accompanied by his cousin. The two men visited Terry's apartment for approximately 30 minutes. On the second occasion, Terry invited Lamar back to her apartment, at which time the two had consensual sex. Lamar did not see Terry's children during either visit to her apartment. Lamar testified that he did not hit, slap, or otherwise inflict any physical harm upon Terry. Lamar testified that he never knew that Terry had children, he never had any contact with Emilliano, nor did he have any

involvement in Emilliano's tragic death.  Lamar testified that he had never been inside Terry's apartment at 13008 Buckeye Road.

{¶30} Sandoval further testified that his investigation of Terry's October 2013 interview revealed a number of inconsistencies.  Sandoval examined Terry's cell phone records and discovered 17 outgoing and 20 incoming text messages, as well as a 10 minute phone call, during the time period Terry claimed to be unconscious because she was drugged by Lamar.  There was also internet activity on Terry's computer, specifically searches pertaining to adoption procedures, during the same time period.

{¶31} The state also called witnesses with regard to Terry's relationship with Emilliano. Adebowale Adedipe, M.D. ("Dr. Adedipe") was Emilliano's pediatrician.  He began treating Emilliano when he was seven months old.   Emilliano was underweight and his weight continued to drop further down the growth chart during Dr. Adedipe's subsequent examinations. Dr. Adedipe further testified that Terry never raised any concerns about Emilliano's behavior or childhood development.

{¶32} April Shepherd ("Shepherd") is a licensed social worker and consultant at the Positive Education Program, a group that provides support to referred parents and children. Shepherd testified that Emilliano and Terry were two of her clients.  Shepherd testified that Emilliano was referred to her agency in May 2012 because Terry was concerned that Emilliano suffered from "physical and communication delays."   Shepherd further testified that Terry claimed to be "overwhelmed with Emilliano's behaviors," that he "wouldn't listen to her," and that Emilliano "was defiant in that if [Terry] asked him to do something, he wouldn't do it." Shepherd stated that Terry desired to obtain "parenting skills" from the program.   Shepherd had concerns about Terry.   Specifically, Shepherd was concerned with Terry's ability to bond with

Emilliano. Shepherd eventually contacted the Department of Children and Family Services after she was aware that one of Emilliano's doctors was seeking to contact Terry.

{¶33} Lateria Foster ("Foster") testified that she has been a foster parent for 17 years. Foster testified that she had been a foster parent to Terry and K.I. Terry and K.T. lived with her when Terry was approximately 14 years old until she was 16 years old. Terry then moved to Mississippi for a period of time and later returned to Ohio. Terry gave birth to Emilliano after she returned to Ohio. Foster continued to assist Terry with day-to-day tasks, including buying and delivering food and providing transportation.

{¶34} Foster was concerned about Emilliano because he would cry when Terry picked him up from Foster's care. Foster testified that Terry stated Emilliano always cried and he was spoiled. Foster described Emilliano as "just a normal baby" that "liked to eat a lot." Foster testified that during the middle of 2012, she had a series of conversations with Terry pertaining to Emilliano. During one conversation, Terry seemed "really frustrated" and referred to Emilliano as the "bad one." Foster then made arrangements for her daughter, "TJ," to care for Emilliano. Emilliano remained with "TJ" until August 2012, which was after Terry gave birth to her third child, R.T. During this time, Foster testified that she noticed Emilliano was beginning to talk, was learning his ABCs, and enjoyed singing along to music. Foster further testified that Terry "felt pressured" to have Emilliano live with her, and that Terry had not "bonded" with Emilliano. Foster lost contact with Terry after Emilliano was returned to her at the end of August 2012.

{¶35} Julia Shelvin ("Shelvin") testified that she and Terry were best friends in high school. She is R.T.'s godmother. Shelvin stated that about two weeks prior to Thanksgiving 2012, Terry told her she was thinking of giving up Emilliano for adoption because of his behavioral problems. Terry called Shelvin after Emilliano went missing, asking if she could assist in the search. Shelvin testified that Terry seemed worried, but she was not crying. Shelvin posted notices pertaining to Emilliano's disappearance and his picture on Facebook and Instagram.

{¶36} Latrisha Harrison ("Harrison") testified that her fiancé is the father of Terry's youngest son, R.T. Terry lived with them for approximately a month in early 2012, when she was pregnant with R.T. Harrison assisted Terry in obtaining food stamps and welfare payments. Harrison testified that Emilliano did not exhibit notable behavioral issues. She described the child as "very fragile" and two or three times smaller than her own son of similar age. Harrison further testified that Terry used to refer to Emilliano as "hard-head," "b***h," and "mother f****r." Harrison stated that on one occasion she and Terry caught Harrison's son, Emilliano, and K.T. drinking water out of a toilet. Terry proceeded to beat Emilliano and K.T. with a belt. Harrison testified that both she and her fiancé were concerned about Terry's discipline style and asked Terry to move out of their home. Harrison learned of Emilliano's disappearance and his eventual death while watching the local news.

{¶37} At the end of the state's case, Terry moved for an acquittal under Crim.R. 29, which the trial court denied.[1] Terry rested without offering any evidence. Defense counsel

---

[1]The state conceded that it did not prove the economic harm required in Count 9 (making false alarms), and therefore, dismissed the furthermore clause. Count 9 then proceeded as a first-degree misdemeanor as opposed to a fourth-degree felony.

requested a jury instruction on reckless homicide, a lesser included offense to aggravated murder. The trial court denied Terry's request. However, the trial court did give a jury instruction on murder for Count 1 (aggravated murder).

{¶38} The jury found Terry not guilty of aggravated murder as originally charged in Count 1, and instead, found her guilty of the lesser included offense of murder. The jury also found Terry guilty of each of the remaining counts. The trial court sentenced Terry in December 2013. For purposes of sentencing, the trial court merged Counts 1, 3, 4, 5, 6, and 7 with the aggravated murder conviction in Count 2. The trial court sentenced Terry to a prison term of 30 years to life on Count 2. The trial court sentenced Terry to three years in prison on Count 8 — tampering with evidence, six months in county jail on Count 9 — making false alarms (which the trial court suspended), and one year in prison on Count 10 — gross abuse of a corpse. The trial court ordered that Terry's sentence on Count 8 be served concurrent to Count 2 and Terry's sentence on Count 10 be served consecutive to Count 2 for a total sentence of 31 years to life in prison.

{¶39} Terry now appeals, raising the following the five assignments of error for review, which shall be discussed together where appropriate.

### Assignment of Error One

The State failed to present sufficient evidence to sustain a conviction against [Terry].

### Assignment of Error Two

[Terry's] convictions are against the manifest weight of the evidence.

### Assignment of Error Three

The trial court erred when it admitted other acts testimony in violation of R.C. 2945.59, Evid.R. 404(B), and [Terry's] rights under Article I, Section 10 of the

Ohio Constitution and the Fourteenth Amendment to the United States Constitution.

Assignment of Error Four

[Terry] was denied effective assistance of counsel as guaranteed by Section 10, Article I, of the Ohio Constitution and the Sixth and Fourteenth Amendments of the U.S. Constitution.

Assignment of Error Five

The trial court erred by refusing to instruct the jury on the lesser included offense of reckless homicide which denied [Terry's] right to a fair trial.

Sufficiency of the Evidence

{¶40} In the first assignment of error, Terry argues there is insufficient evidence to sustain her convictions. Specifically, she argues there is no evidence that proves she murdered Emilliano.

{¶41} In *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 113, the Ohio Supreme Court explained the standard for sufficiency of the evidence as follows:

> Raising the question of whether the evidence is legally sufficient to support the jury verdict as a matter of law invokes a due process concern. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. In reviewing such a challenge, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus, following *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶42} Terry was convicted of murder in violation of R.C. 2903.02(A), which provides that: "[n]o person shall purposely cause the death of another[,]" and R.C. 2903.02(B), which provides that: "[n]o person shall cause the death of another as a proximate result of the offender's committing or attempting to commit an offense of violence that is a felony of the first or second degree[.]" Terry was also convicted of aggravated murder in violation of R.C. 2903.01(C),

which provides that: "[n]o person shall purposely cause the death of another who is under thirteen years of age at the time of the commission of the offense." Terry contends that there was no evidence as to how the murder happened, who committed the murder, and when or where the crime scene occurred.

{¶43} With the absence of eyewitness testimony to the murder, the state premised its case against Terry on substantial circumstantial evidence. "Circumstantial evidence is defined as '[t]estimony not based on actual personal knowledge or observation of the facts in controversy, but of other facts from which deductions are drawn, showing indirectly the facts sought to be proved[.]'" *State v. Nicely*, 39 Ohio St.3d 147, 150, 529 N.E.2d 1236 (1988), quoting *Black's Law Dictionary* 221 (5th Ed.1979). There is no difference, in terms of probative value, between circumstantial evidence and direct evidence. *Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492, paragraph one of the syllabus.

{¶44} In the instant case, the state presented over 40 witnesses and approximately 500 exhibits during Terry's trial. The state presented testimony from law enforcement officers who interacted with Terry during the investigation into Emilliano's disappearance, medical and trace evidence, and testimony from individuals who had first-hand knowledge of Terry's relationship with Emilliano.

{¶45} Law enforcement officials testified as to Terry's general lack of concern for Emilliano during the period immediately following his disappearance. Law enforcement officials also testified to the three different explanations Terry gave as to Emilliano's disappearance and tragic death, and how each was shown to be untrue. First, on November 25, 2012, Terry reported that Emilliano went missing while she was at Kossuth Park with her three sons. She reported that he got into a black car. She also stated to officers that they stayed in

her apartment all day until they left for the park. Her interview with Fragomeli, however, revealed several inconsistencies to this explanation. Surveillance photos from local businesses depict only K.T. walking with Terry to the park on November 25, 2012. In addition, a witness who observed Terry on the day of Emilliano's disappearance only saw Terry and K.T. walking in the vicinity of Kossuth Park. Furthermore, Terry's cell phone placed her near Tower City at approximately 2:30 p.m. on the afternoon of November 25, 2012. While at Tower City, Terry went to McDonald's and returned clothes in size "3T" at the Childrens Place. Fragomeli then informed Terry that Emilliano's body was recovered from a garbage truck that collected trash from her apartment building. Terry began to cry and stated that she did not intentionally kill her son.

{¶46} Terry's second explanation was that when she woke up on the morning of November 24, 2012, Emilliano was dead. Terry did not know how Emilliano died. She was scared that others would blame her for Emilliano's death, so she decided to dispose of Emilliano's body by wrapping him in trash bags and placing him in the dumpster by her apartment building. Terry stated that the only injury Emilliano had was a head injury from the day before when he struck his head on a car seat. The medical and trace evidence, however, revealed otherwise.

{¶47} Dr. Wiens testified that all of Emilliano's injuries, except the pelvic fracture, were inflicted prior to or at the time of his death. During her examination, she observed multiple skull fractures, rib fractures, subgaleal hematomas (bruising underneath the scalp), lacerations, multiple contusions, and intramuscular bruising on Emilliano's back and right arm. Emilliano's liver had sustained a severe laceration, to the point that the liver was nearly torn in half. This injury was caused by severe impact to the Emilliano's abdomen. Dr. Wiens further testified that

based on the degree of decomposition, Emilliano had been dead for approximately five to seven days prior to the time his body was discovered, making his time of death on or around November 21, 2012. The cause of Emilliano's death were blunt impacts to the head, torso, and extremities with skeletal soft tissue and visceral injuries (injuries to the liver and the brain). The manner of his death was ruled a homicide.

{¶48} Moreover, several locations in Terry's apartment tested presumptively positive for blood, including the radiator in the living room, a wall in Terry's front bedroom, and the area surrounding the sink in Terry's kitchen. A pair of Terry's boots also tested presumptively positive for blood. The blood stains on the radiator were categorized as blood splatter. The trace examiner did not find any indication of blood on the car seat in Terry's car. In addition, samples taken from the knot area of the outer bags used to dispose of Emilliano's body matched Terry's DNA. The blood samples collected from Terry's boots and the baseboard in the bedroom all matched Emilliano's DNA.

{¶49} In October 2013, Terry implicated Lamar, a.k.a. "Red," as a third explanation for Emilliano's tragic death. Terry stated that Lamar entered her apartment, pushed her down onto her bed, inserted a needle into her arm, causing her to lose consciousness, and removed her clothes. When she woke up, she found Emilliano in a closet beaten up and bloody with a note pinned to his chest, stating that "[i]f you try to find me I'm going to kill you and your kids." Terry then removed Emilliano from the closet, placed him in trash bags, and placed the bags in the dumpster behind her apartment building. Sandoval's investigation of Terry's claims revealed several inconsistencies.

{¶50} Terry's cell phone had 17 outgoing and 20 incoming text messages, as well as a 10 minute phone call, during the time period Terry claimed to be unconscious because she was

drugged by Lamar. There was also internet activity on Terry's computer, specifically searches pertaining to adoption procedures, during the same time period. None of the physical or trace evidence collected during the investigation connected Lamar to Emilliano's death and disappearance.

{¶51} Based on the foregoing, we find that the law enforcement officials' testimony, coupled with the medical and trace evidence, prove that Terry acted purposefully when she beat Emilliano to death during the days preceding November 25, 2012. Thus, any rational trier of fact could have found the essential elements of the murder and aggravated murder proven beyond a doubt.

{¶52} Accordingly, the first assignment of error is overruled.

<u>Manifest Weight</u>

{¶53} In the second assignment of error, Terry argues there was no credible, reliable evidence that she "purposely caused the death of her own child."

{¶54} We note that in contrast to a sufficiency argument, a manifest weight challenge questions whether the state met its burden of persuasion. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 390, 1997-Ohio-52, 678 N.E.2d 541. The Ohio Supreme Court in *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, has stated:

> [T]he reviewing court asks whose evidence is more persuasive — the state's or the defendant's? * * * "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." [*Thompkins* at 387], citing *Tibbs v. Florida* (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652.

{¶55} Moreover, an appellate court may not merely substitute its view for that of the jury,

but must find that "'in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983). Accordingly, reversal on manifest weight grounds is reserved for "'the exceptional case in which the evidence weighs heavily against the conviction.'" *Id.*, quoting *Martin*.

{¶56} Terry presented three different explanations as to Emilliano's disappearance and death, each of which had several inconsistencies. The jury chose to assign more weight and credibility to the physical evidence and the testimony of the state's witnesses, rather than to Terry's different explanations. Therefore, we find that the convictions are not against the manifest weight of the evidence. We cannot say that the jury lost its way and created a manifest injustice in convicting Terry.

{¶57} Accordingly, the second assignment of error is overruled.

Ineffective Assistance of Counsel — Other-Acts Testimony

{¶58} In the third assignment of error, Terry argues the state relied on "other-acts" evidence to prove she purposefully committed murder. In the fourth assignment of error, Terry argues defense counsel was ineffective for failing to object to this evidence.

{¶59} To establish ineffective assistance of counsel, Terry must show: (1) counsel's representation was deficient in that it "fell below an objective standard of reasonableness" and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Sanders*, 94 Ohio St.3d 150, 151, 2002-Ohio-350, 761 N.E.2d 18. In Ohio, an attorney properly licensed is presumed competent. *State v. Lott*, 51

Ohio St.3d 160, 174, 555 N.E.2d 293 (1990). The defendant has the burden of proof and must overcome the strong presumption that counsel's performance was adequate or that counsel's action might be sound trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 100, 477 N.E.2d 1128 (1985).

{¶60} Terry argues that the testimony of Dr. Adedipe, Foster, Harrison, and Shepherd should not have been admitted. Dr. Adedipe testified about Emilliano's malnourished and underdeveloped condition and Terry's apparent inability to bring Emilliano up to a healthy body weight. Foster, Harrison, and Shepherd each testified about their interactions with Terry and her relationship with Emilliano. Foster testified that Emilliano would cry to the point of concern whenever Terry would pick him up from Foster's home. Terry referred to Emilliano as the "bad one" and that Terry "felt pressured" to have Emilliano live with her. Harrison testified to Terry's behavior toward Emilliano and how she would call Emilliano "hard-head," "b***h," and "mother f****r." Harrison observed Terry beat Emilliano and K.T. with a belt, and subsequently asked Terry to leave her home because of her extreme use of corporal punishment. Shepherd, a social worker, testified she was concerned that Emilliano had "behavior attachment" issues.

{¶61} Terry contends this evidence portrayed her as a bad mother and the purpose of this testimony was to cause the jury to be biased against her. The state, on the other hand, contends that the evidence was relevant and admissible under Evid.R. 404(B) and R.C. 2945.59, which allow for the admission of other-acts evidence for the purpose of showing identity, intent, motive, or lack of mistake or accident.

**{¶62}** We must first determine whether the testimony was inadmissible to warrant an objection. We note that "'[e]vidence that an accused committed a crime other than the one for which he is on trial is not admissible when its sole purpose is to show the accused's propensity or inclination to commit crime or that he acted in conformity with bad character.'" *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 67, quoting *State v. Williams*, 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278, ¶ 15, citing *State v. Curry*, 43 Ohio St.2d 66, 68, 330 N.E.2d 720 (1975).

**{¶63}** Certain exceptions, however, exist to this common law rule — R.C. 2945.59 and Evid.R. 404(B). In R.C. 2945.59, the General Assembly "codified certain exceptions to the common law regarding the admission of evidence of other acts of wrongdoing." *Id.* This statute provides that:

> In any criminal case in which the defendant's motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing an act is material, any acts of the defendant which tend to show his motive or intent, the absence of mistake or accident on his part, or the defendant's scheme, plan, or system in doing the act in question may be proved, whether they are contemporaneous with or prior or subsequent thereto, notwithstanding that such proof may show or tend to show the commission of another crime by the defendant.

**{¶64}** Evid.R. 404(B) is "in accord with R.C. 2945.59," but some differences do exist. *Williams* at ¶ 16-17. Evid.R. 404(B) provides that:

> Evidence of other crimes, wrong, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In criminal cases, the proponent of evidence to be offered under this rule shall provide reasonable notice in advance of trial, or during trial if the court excuses pretrial notice on good cause shown, of the general nature of any such evidence it intends to introduce at trial.

**{¶65}** The Ohio Supreme Court has explained that: "[t]he statute affords the trial court

discretion to admit evidence of any other acts of a defendant in cases where motive or intent, absence of mistake or accident, or scheme, plan, or system in doing an act is *material*." (Emphasis sic.) *Williams* at ¶ 17. ("[M]aterial means '[h]aving some logical connection with the consequential facts.'") *Id*., quoting *Black's Law Dictionary* 1066 (9th Ed.2009). Whereas, Evid.R. 404(B) contains no reference to materiality. Rather, Evid.R. 404(B) "affords the trial court discretion to admit evidence of other crimes, wrongs, or acts for 'other purposes,' including, but not limited to, those set forth in the rule. Hence, the rule affords broad discretion to the trial judge regarding the admission of other acts evidence." *Williams* at ¶ 17.

**{¶66}** In determining whether to permit other-acts evidence to be admitted, trial courts should conduct the following three-step analysis:

> (1) determine if the other-acts evidence "is relevant to making any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence" under Evid.R. 401; (2) determine if the other acts "is presented to prove the character of the accused in order to show activity in conformity therewith or whether the other acts evidence is presented for a legitimate purpose, such as those stated in Evid.R. 404(B)"; and (3) consider "whether the probative value of the other acts evidence is substantially outweighed by the danger of unfair prejudice."

*Ceron,* 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, ¶ 70, citing *Williams* at ¶ 20.

**{¶67}** With regard to the first and second steps of the *Williams* test, we find the challenged testimony was relevant and was offered for a legitimate purpose because it shows Terry's motive and intent. The testimony regarding Emilliano's medical issues that were unattended, Terry's reference to Emilliano as "hard-head," "b***h," and "mother f****r," and the pressure Terry felt to have Emilliano live with her, if believed by the jury, provided the context for the murder and made Terry's actions more understandable to the jurors. *Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, at ¶ 70, citing *State v. Drummond*, 111 Ohio

St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 76; *see also State v. Thompson*, 10th Dist. Franklin No. 96APA12-1660, 1997 Ohio App. LEXIS 4351 (Sept. 23, 1997) (defendant's lack of effort to properly bond with her daughter and her inability to cope with the pressures of single motherhood were part of the immediate background of the crime and admissible in proving defendant's motive and intent to kill her daughter).

{¶68} This evidence was offered as part of the background of the crimes alleged and to prove that Terry was so ill-equipped to cope with the pressures and stresses involved in providing and caring for Emilliano. *See Thompson* at *23. The testimony is relevant to the crimes for which Terry was charged to demonstrate that she had both a motive and the intent to purposely cause Emilliano's tragic death. As a result, the first and second steps in *Williams* are satisfied.

{¶69} With regard to the last step of the *Williams* test, we find that the danger of unfair prejudice did not substantially outweigh the probative value of the challenged testimony. Unfairly prejudicial evidence is that which might result in an improper basis for a jury decision. *Oberlin v. Akron Gen. Med. Ctr.*, 91 Ohio St.3d 169, 172, 2001-Ohio-248, 743 N.E.2d 890. Generally, "'unfairly prejudicial evidence appeals to the jury's emotions rather than intellect.' Weissenberger, Ohio Evidence (2000) 85-87, Section 403.3." *Id.* The challenged evidence, in the instant case, does not meet this standard. As we previously stated, this testimony was properly admitted to prove Terry's motive and intent. Moreover, it is apparent from the record that the trial court gave a thoughtful and deliberate review of the evidence in question, concluded it was admissible for other purposes, and concluded that the probative value of the evidence substantially outweighed the danger of unfair prejudice.[2]

---

[2] Prior to trial, Terry filed a motion to exclude evidence related to other crimes, wrongs, or acts and the state filed a notice of intent to use Evid.R. 404(B)

**{¶70}** Therefore, we find that the trial court properly admitted the challenged evidence.

**{¶71}** We note that even if the other-acts evidence was improperly admitted, its admission would be harmless because it is our view that the outcome of the trial would have been the same even if this evidence had not been admitted. This is because the state presented substantial other evidence of Terry's guilt. *State v. Marquand*, 8th Dist. Cuyahoga No. 99869, 2014-Ohio-698, ¶ 59, citing Crim.R. 52(A) and *State v. McKnight*, 107 Ohio St.3d 101, 2005-Ohio-6046, 837 N.E.2d 315, ¶ 88.

**{¶72}** Having found that the challenged testimony was proper Evid.R. 404(B) evidence and relevant, we further find that an objection by defense counsel to this testimony would have been futile.

**{¶73}** Therefore, the third and fourth assignments of error are overruled.

<u>Jury Instructions — Lesser Included Offense</u>

**{¶74}** In the fifth assignment of error, Terry argues that the trial court erred by refusing to instruct the jury on the lesser included offense of reckless homicide.

**{¶75}** The question of whether a particular offense should be submitted to the finder of fact as a lesser included offense involves a two-tiered analysis. *State v. Evans*, 122 Ohio St.3d

---

evidence of prior acts. Specifically, the state intended to introduce evidence of other injuries Emilliano sustained prior to his death, the systematic abuse by Terry, and the fact that Terry had researched adoption and discussed with others her desire not to live with Emilliano. Terry also filed a motion in limine, seeking to exclude the testimony of Dr. Feingold from MetroHealth Hospital because his medical report was not provided by the state with the time constraints of Crim.R. 21(K). A review of the record reflects that Dr. Feingold never testified at trial. Additionally, another witness for the state, Harold Brown ("Brown"), was not permitted to testify. Brown was a social worker who supervised Terry while she was under the foster care system. After hearing arguments relating to the admissibility of Brown's testimony, the trial court excluded Brown as a witness, finding that his testimony was extrinsic evidence.

381, 2009-Ohio-2974, 911 N.E.2d 889, ¶ 13. "The first tier, also called the 'statutory-elements step,' is a purely legal question, wherein we determine whether one offense is generally a lesser included offense of the charged offense." *State v. Deanda*, 136 Ohio St.3d 18, 2013-Ohio-1722, 989 N.E.2d 986, ¶ 6, citing *State v. Kidder*, 32 Ohio St.3d 279, 281, 513 N.E.2d 311 (1987). The second tier looks to the evidence in a particular case and determines whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13, quoting *Shaker Hts. v. Mosely*, 113 Ohio St.3d 329, 2007-Ohio-2072, 865 N.E.2d 859, at ¶ 11. "Only in the second tier of the analysis do the facts of a particular case become relevant." *Deanda* at ¶ 6.

{¶76} In the first tier, the trial court shall consider whether (1) "one offense carries a greater penalty than the other," (2) "some element of the greater offense is not required to prove commission of the lesser offense," and (3) "the greater offense as statutorily defined cannot be committed without the lesser offense as statutorily defined also being committed." *Evans* at paragraph two of the syllabus, clarifying *State v. Deem*, 40 Ohio St.3d 205, 533 N.E.2d 294 (1988).

{¶77} After it has been determined that the offense is a lesser included offense, the second tier mandates that courts look to the evidence in a particular case and determine whether "'a jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Deanda* at ¶ 6, quoting *Evans* at ¶ 13. *See also State v. Thomas*, 40 Ohio St.3d 213, 216, 533 N.E.2d 286 (1988). Moreover, in *State v. Wine*, Slip Opinion No. 2014-Ohio-3948, ¶ 34, the Ohio Supreme Court recently stated that: "[t]he trial court, after reviewing the evidence, determines whether an instruction on lesser included offenses is appropriate. The trial court must give an instruction on a lesser included offense if

under any reasonable view of the evidence it is possible for the trier of fact to find the defendant not guilty of the greater offense and guilty of the lesser offense."

{¶78} With respect to the first issue, we must first determine if the reckless homicide is a lesser included offense of aggravated murder.[3] The Ohio Supreme Court in *State v. Trimble*, 122 Ohio St.3d 297, 2009-Ohio-2961, 911 N.E.2d 242, already determined that it is. *Id.* at ¶ 190.

{¶79} Therefore, we must next look to the evidence in this case and determine whether the "'jury could reasonably find the defendant not guilty of the charged offense, but could convict the defendant of the lesser included offense.'" *Evans* at ¶ 13. Here, Dr. Wiens described the nature and extent of Emilliano's injuries to the jury. Emilliano sustained multiple skull fractures, subgaleal hematomas, and lacerations and contusions to the head. Dr. Wiens also testified to intramuscular bruising on the back of Emilliano's shoulder blades and on the back of the his right arm, fractures to Emilliano's ribs, as well as a laceration to the his liver. The laceration to Emilliano's liver was severe enough to cut all the way through and nearly split the liver in half. Taking all of the evidence into consideration, no trier of fact could reasonably reject the greater offense of aggravated murder and find Terry guilty of the lesser included offense of reckless homicide. Rather, the jury concluded that Terry acted purposely when she beat Emilliano to death.

{¶80} Therefore, the fifth assignment of error is overruled.

{¶81} Judgment is affirmed.

---

[3] R.C. 2903.041(A) provides that: "[n]o person shall recklessly cause the death of another[.]" "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature." R.C. 2901.22(C).

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  The defendant's conviction having been affirmed, any bail pending appeal is terminated.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY EILEEN KILBANE, JUDGE

SEAN C. GALLAGHER, P.J., and
KENNETH A. ROCCO, J., CONCUR